

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00218-CV

**IN THE INTEREST OF R.M.**, a Child

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2018PA01262
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Sandee Bryan Marion, Chief Justice

Sitting:        Sandee Bryan Marion, Chief Justice
              Luz Elena D. Chapa, Justice
              Irene Rios, Justice

Delivered and Filed: August 7, 2019

AFFIRMED IN PART, REVERSED IN PART, CAUSE REMANDED

Appellant Tiffany files this accelerated appeal from the trial court's order terminating her parental rights to her child, R.M. Tiffany challenges the sufficiency of the evidence to support the trial court's finding that termination is in R.M.'s best interest. Because we conclude the evidence is legally and factually insufficient to support the trial court's best interest finding, we reverse the trial court's order of termination and remand the cause for a new trial. Because Tiffany does not challenge the appointment of the Texas Department of Family and Protective Services ("the Department") as managing conservator, we affirm that portion of the trial court's order.

## Background

The Department removed R.M. from Tiffany's custody based on allegations that while Tiffany and R.M. were living at Haven for Hope shelter in San Antonio, Tiffany "was cursing and

yelling at" R.M., R.M. was "seen wearing dirty clothes, dirty diapers," R.M. was seen "walking down the hallway by himself with Tiffany not around," and "there [were] also concerns with [Tiffany's] mental health." There is no evidence in the record indicating who made these allegations or whether and, if so, how the Department investigated them.

The Department filed a petition in June 2018 to terminate Tiffany's and the alleged father's parental rights to R.M. On April 2, 2019, the trial court held a bench trial. At the time of trial, R.M. was two years old. The alleged father did not appear for trial, and Tiffany appeared with counsel and announced "ready." The Department elicited testimony from two witnesses, and Tiffany and her mother also testified.

## A.     The Department's first witness

The Department's first witness, Gina Evans, testified by telephone from Houston. Evans testified she is familiar with Tiffany because Tiffany "came into my agency to complete a court mandated psychological evaluation." There is nothing in the record, however, establishing Evans' job title, qualifications, or employer, nor whether Evans personally performed the psychological evaluation.

Evans testified she prepared a report, but it was not offered or admitted into evidence. According to Evans, Tiffany's "report was somewhat inconclusive, but she had major depressive disorder and post-traumatic stress symptoms."[1] Evans did not testify whether she or anyone else actually diagnosed Tiffany with any particular mental illness. Instead, referring to Tiffany's symptoms, the Department asked Evans: "[H]ow could these diagnoses impact [Tiffany's] life?" Evans responded: "They can impact [Tiffany's] life by poor symptom management. And if her symptoms are poorly managed, then they would impact her judgment and her decision making."

---

[1] Evans later testified: "What made it inconclusive was the objective measure was answered inconsistently by [Tiffany]."

Evans agreed poor symptom management "could interfere with [Tiffany's] ability to parent a young child." Evans also testified that "if [Tiffany] does not follow [Evans'] recommendations" to have psychiatric care and appropriate medication management and monitoring, then Evans would have "severe concerns about [Tiffany's] parenting." Nothing in the record establishes that Evans communicated her recommendations to Tiffany.

Also, nothing in the record demonstrates whether Evans has any personal knowledge of Tiffany's failure to manage her symptoms. While Evans testified Tiffany "didn't have a habit of taking [medication] consistently," nothing in the record establishes that Tiffany had been prescribed any particular medication that she refused to take. Evans testified Tiffany "didn't seem to understand the severity that her symptoms could play out in her decision making," explaining: "In discussing her decision making, and instability, and moving, and thought process, [Tiffany] did not think to articulate the importance of staying stable on medication, and the importance of making sound decisions, and the importance of staying on a regular medication regimen, and that being an aid to making sound decisions." Evans did not testify whether she or anyone else explained to Tiffany "the importance of staying on a regular medication regimen." Evans acknowledged that Tiffany stated she was seeing a psychiatrist.

## B.    The Department caseworker

The Department's second witness was the caseworker assigned to R.M.'s case approximately four months after his removal. The caseworker testified she prepared a service plan for Tiffany that required her to "engage in parenting, individual therapy, a psychological, maintain her mental health needs, maintain contact with the caseworker, randomly drug test, and maintain stable housing and employment." Tiffany submitted to a psychological examination in February 2019 but did not provide proof that she completed parenting classes and individual therapy. Tiffany was compliant with drug testing before September 2018 and tested negative each time, but she

refused to submit to urinalysis in September and November 2018. There is no other evidence in the record indicating Tiffany used or was suspected of using illegal drugs before or during the pendency of this case. At the time of trial, Tiffany was living at Star of Hope shelter in Houston. While the case was pending, Tiffany also resided at Haven for Hope, a boyfriend's home in Universal City, and the home of a relative in Houston. Tiffany moved to Houston in or around November 2018 and had only three of her allowed weekly visits with R.M. between then and trial. The caseworker testified she was concerned Tiffany was pregnant and would not be permitted to live with more than one child at Star of Hope. Tiffany was not employed at the time of trial and had not been employed during the pendency of the case.

The caseworker testified if R.M. were returned to Tiffany's custody, she believes "there's a danger of [R.M.] being left alone, with [Tiffany's] inconsistency with her treatment, not being able to take care of herself or [R.M.], taking him to his doctors' appointments, dental appointments, therapy appointments. [Tiffany's] ability to successfully manage [R.M.'s] basic needs, such as housing, employment." The caseworker opined: "[W]ith [Tiffany's] decision-making choices, I don't believe that it's safe for [R.M.] to be in her care," although R.M. does not have any special needs.

Aside from the fact that Tiffany failed to complete her service plan, there is nothing in the record establishing what treatment Tiffany required and whether and how Tiffany was "inconsistent" with that treatment. Nothing in the record demonstrates that the caseworker provided any information to Tiffany about the results of the psychological evaluation or the psychologist's recommendations. The caseworker did not explain how Tiffany demonstrated "not being able to take care of herself or [R.M.]" or whether Tiffany failed to take R.M. to any scheduled appointments.

At the time of trial, R.M. was placed in a foster-to-adopt home where he is doing "well." The caseworker testified the foster family is meeting all of R.M.'s needs at this time and has been taking R.M. to his appointments and making sure he is appropriately clothed and fed. The caseworker believes it is in R.M.'s best interest to remain in the foster home because he is in "a stable, safe environment" where he is "thriving [and] flourishing." There is nothing in the record, however, demonstrating the parental abilities of the foster family, the stability of their home, or whether adoption by the foster family was the Department's goal for R.M.

## C.     Tiffany's witnesses

Tiffany's mother testified that Tiffany and R.M. lived with her in New Orleans, Louisiana from R.M.'s birth in November 2016 until sometime in 2018. Tiffany's mother testified Tiffany is a "very loving mother" who loves spending time with R.M. and taking him to the park. Tiffany's mother does not believe Tiffany has any mental health issues, although she has a temper and "her nerves get real antsy." Tiffany needs to "watch the people that she's around," but her mother otherwise has no concerns about Tiffany's ability to parent R.M. Tiffany's mother has prior experience with child protective services, and she acknowledged her son is in foster care due to a medical condition better managed by the foster mother.

Tiffany testified she moved to Houston in December 2018 because she believes there are better opportunities in Houston for her and R.M. and because she has a cousin in Houston with whom she could live. Tiffany's cousin encouraged her to move to Star of Hope shelter because its programs could help Tiffany achieve her goals and because it would be productive for R.M. to stay there too. At the time of trial, Tiffany was enrolled in a full-time GED program at Star of Hope, which she testified prevents her from being employed. Tiffany plans to remain at Star of Hope until she finishes the six-month GED program, and then she expects Star of Hope to place

her in permanent housing. According to Tiffany, the shelter provides daycare and permits her to have up to five children with her. Tiffany would not confirm whether she is currently pregnant.

Tiffany conceded she has not seen a psychiatrist since she completed the court-mandated psychological evaluation, but she testified she was unaware that she needed to follow up with a psychiatrist and would have done so if she had known she needed to. Tiffany also has not been taking any medication, explaining: "I feel like this. If they do feel like I do need to take medication, there is a psychiatrist at Star of Hope that can prescribe me medication for the reason they feel that I need to take it. I don't have an issue with taking medication. But I had two psychiatrists tell me they don't feel I need to be on it. Then I took their advice." Tiffany testified the caseworker did not give her a copy of the psychological evaluation, discuss the results with her, or tell her what the psychologist's recommendations were or that she needed to follow up with a psychiatrist. Tiffany testified: "I did not find out about the inconclusive until today in court. All of this information that she is giving me is practically brand new news to me."

### D.     The trial court's ruling

At the conclusion of testimony and after closing arguments, the trial court granted the Department's petition for termination and terminated Tiffany's and the alleged father's parental rights to R.M. The trial court found by clear and convincing evidence that Tiffany constructively abandoned R.M. and failed to complete her service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O). The trial court also found termination of Tiffany's parental rights was in R.M.'s best interest. The trial court explained its ruling, in part, as follows:

> A lot of times, these cases seem very unfair. I think this is one of them as well. . . .
>
> I think [Tiffany] does have mental health issues that are kind of—not to the point of institutionalizing, and not to the point of hospitalizations, but to the point that it creates a difficulty in managing day-to-day life.

> As sad as that is and as difficult as that is, that it's been a life of shelters and moving and an inability to hold jobs, and an inability to stabilize, I don't know that my duty to the best interest of the child, that the child bears the brunt of the compassion or emotion that you may feel for [Tiffany], which certainly is real.
>
> We're left today with the law that says resolve these cases within a year, because [R.M.'s] life has been held for half his life, which is true.

The trial court encouraged the Department to carefully "continue the study of the maternal grandmother" as a permanent placement for R.M. because the "[m]aternal grandmother, by all appearances today, seems extremely appropriate," despite her prior issue with child protective services in Louisiana.

In a single issue on appeal, Tiffany challenges the trial court's finding that termination is in RM's best interest. The alleged father does not appeal.

**Standard of Review**

To terminate parental rights, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1), and (2) termination is in the best interests of the child. TEX. FAM. CODE ANN. §§ 161.001(b), 161.206(a); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

We review the legal and factual sufficiency of the evidence using well-established standards of review. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (legal sufficiency). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the finding, assuming the factfinder resolved all disputed facts in favor of its finding and disregarding all evidence a reasonable factfinder could have disbelieved or found incredible. *In re J.P.B.*, 180 S.W.3d at 573. In reviewing the factual sufficiency of the evidence, we ask whether a factfinder, in light of the entire record, reasonably

could form a firm belief or conviction about the truth of the Department's allegations. *In re H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b)). In determining the best interest of a child, we apply the factors set forth in section 263.307 of the Family Code, as well as the non-exhaustive *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

## Discussion

In its closing argument, the Department argued the trial court should terminate Tiffany's parental rights because of Tiffany's "stability and mental health issue," which Tiffany has "consistently not addressed." The Department also argued:

> [T]here was testimony from the psychologist that said this child could potentially be in danger if returning to her care if [Tiffany] did not properly manage . . . via medication and a psychiatrist, her mental health diagnosis. And there's testimony that she has not managed those issues. We have grave concerns about if the child was to return to her care at this time.

"Mental illness of a parent is not, in and of itself, grounds for termination of the parent-child relationship." *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Carter v. Dallas Cnty. Child Welfare Unit*, 532 S.W.2d

140, 141–42 (Tex. Civ. App.—Dallas 1975, no writ)). Rather, the trial court must consider whether a parent's mental illness renders her unable to provide for her child now and, with reasonable probability, until the child reaches majority. *Id.* (citing *Salas v. Tex. Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2002, no pet.)).

Courts have found termination is in the child's best interest where the evidence demonstrates the parent has a diagnosed mental illness and has failed or refused to take prescribed medications necessary to function appropriately. For instance, this court held the evidence was sufficient to support termination of a mother's parental rights to her three children where: (1) the mother's parent testified the mother was diagnosed at age fourteen with bipolar disorder but stopped taking prescribed medications two years later; (2) a mental health therapist testified the mother, while unmedicated, demonstrated paranoia and delusions; and (3) the caseworker testified the mother repeatedly stated she would take medication but then did not do so and claimed taking medication was against her civil rights. *In re B.G.S.*, No. 04-06-00562-CV, 2007 WL 1341401, at *3 (Tex. App.—San Antonio May 9, 2007, pet. denied) (mem. op.). Similarly, our sister court held the evidence supporting termination of a father's parental rights was sufficient where: (1) the doctor who performed a psychological evaluation of the father diagnosed him with paranoid schizophrenia and testified the father demonstrated resistance to treatment even when told directly that treatment might be critical to his ability to parent his children; and (2) the father evinced signs of paranoid schizophrenia while testifying and "exhibited an intent to *never take* medication in the future." *In re B.L.M.*, 114 S.W.3d 641, 645–47 (Tex. App.—Fort Worth 2003, no pet.) (emphasis in original); *see also Liu*, 273 S.W.3d at 792–94 (holding evidence supported termination where parent diagnosed with schizophrenia was hospitalized multiple times for repeated refusal to take prescribed medications and had a history of violent and inappropriate behavior while not taking medication, including threatening to shoot the caseworker assigned to the case).

In this case, in contrast, there is nothing in the record before us establishing that Tiffany has a diagnosed mental illness that she has consistently failed to address with medication or treatment. Although Gina Evans testified Tiffany "came into my agency to complete a court mandated psychological evaluation," nothing in the record establishes Evans' identity, professional qualifications, or employer, nor whether Evans either personally performed Tiffany's psychological evaluation or otherwise had personal knowledge of Tiffany's evaluation. Even assuming Evans is qualified to opine on Tiffany's mental health and ability to parent R.M., Evans testified Tiffany's evaluation was "somewhat inconclusive" and merely speculated that R.M. *could* be endangered *if* Tiffany is unable to effectively manage symptoms of major depressive disorder and post-traumatic stress.

Nothing in the record establishes Tiffany was ever informed of the results of the psychological evaluation or of any recommended course of medication and treatment. Although Tiffany failed to provide proof that she completed individual therapy as required by her service plan, Evans confirmed that Tiffany reported she had resumed seeing a psychiatrist. In addition, while Tiffany told Evans she "didn't have a habit of taking [medication] consistently," there is no evidence Tiffany failed or refused to take any prescribed medications. Tiffany testified two psychiatrists advised her that she did not need medication but stated she is willing to take any medication prescribed by the psychiatrist at Star of Hope shelter.

Regarding any additional danger Tiffany's mental illness symptoms pose to R.M., the record is equally scant. The Department argued Tiffany's inability to maintain stable housing is a danger to R.M. and emphasized that Tiffany only visited R.M. three times after moving to Houston. At the time of trial, however, Tiffany was living in a long-term shelter that she testified provides daycare and transportation, as well as psychiatric services and a full-time GED program in which Tiffany was enrolled. Tiffany testified she moved to Houston for better opportunities for herself

and R.M., as well as to be nearer to supportive family members. Further, while Tiffany visited R.M. less frequently after moving to Houston, which she testified was due to lack of transportation, she did not cease visiting him altogether. There is nothing in the record suggesting Tiffany intended to abandon R.M. or that Tiffany ceased communicating with the Department after moving to Houston. To the contrary, Tiffany submitted to the psychological evaluation in February 2019—after she moved.

The record also contains insufficient evidence of any additional factors supporting the trial court's best interest finding. R.M. is too young to express his desires, and the record contains minimal evidence regarding his current foster placement. There is no evidence in the record regarding whether R.M. is bonded with the foster parents or whether the foster parents plan to adopt him. Although the Department caseworker testified the foster family is currently meeting R.M.'s needs, there is no evidence in the record regarding the foster family's ability to meet R.M.'s needs in the future. R.M. does not have any special needs requiring special care.

Based on the limited trial record before us, we conclude the Department did not meet its burden to overcome the strong presumption that keeping R.M. with Tiffany is in his best interest. *See In re R.R.*, 209 S.W.3d at 116. We also conclude the Department failed to demonstrate by clear and convincing evidence that Tiffany has a mental illness that renders her unable to provide for R.M. now or in the future. *See Liu*, 273 S.W.3d at 791. Accordingly, we sustain Tiffany's sole issue and reverse the portion of the trial court's order terminating Tiffany's parental rights to R.M.

**Conclusion**

Because we conclude the evidence is legally and factually insufficient to support the trial court's best interest finding, we reverse the portion of the trial court's order terminating Tiffany's parental rights and remand this cause to the trial court for a new trial. Because Tiffany does not

challenge the portion of the trial court's order appointing the Department R.M.'s managing conservator, we do not disturb that portion of the trial court's order.

Sandee Bryan Marion, Chief Justice